UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN P. WHEELER,

                              Plaintiff,

                                                          **Hon. Hugh B. Scott**

v.                                                        11CV965A

                                                          **Report
                                                          and
COMMISSIONER OF SOCIAL                                    Recommendation**
SECURITY[1],

                              Defendant.


        Before the Court are the parties' respective motions for judgment on the pleadings

(Docket Nos. 13 and 15).

## INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the Commissioner of Social Security that plaintiff is not disabled and, therefore, is not entitled

to disability insurance benefits and/or Supplemental Security Income benefits.


## PROCEDURAL BACKGROUND

        The plaintiff, John P. Wheeler ("Wheeler" or "plaintiff"), filed an application for

disability insurance benefits on October 5, 2004 claiming that he had become disabled on

January 1, 2000. (R. 336A).   That application was denied.  The plaintiff appeared before an

_____

        [1]For convenience, defendant will be identified by the official title only.  <u>See</u> Fed. R. Civ.
P. 25(d); 42 U.S.C. § 405(g) (action survives despite change in office of Commissioner).

Administrative Law Judge ("ALJ"), who considered the case de novo and concluded, in a written decision dated March 26, 2007, that the plaintiff was not disabled within the meaning of the Social Security Act. The plaintiff filed a request for review by the Appeals Council, which denied the appeal. The plaintiff subsequently commenced a federal court action challenging the denial of benefits. On April 23, 2008, the determination to deny benefits was remanded by stipulation. See Wheeler v. Astrue, Civ. No. 01CV749S at Docket No. 4. Upon remand, a supplemental hearing was conducted before the ALJ on January 13, 2009. (R. 474). The plaintiff amended his alleged disability onset date to October 5, 2004. (R. 476). The ALJ determined that the plaintiff became disabled as of May 8, 2007 – the date of his 55th birthday. (R. 388). The plaintiff appealed that determination to the Appeals Council, which denied the request for review, making the ALJ's decision the final decision of the Commissioner on September 16, 2011.

Plaintiff subsequently commenced this action (Docket No. 1). He alleges that he became disabled on October 5, 2004[2] and seeks benefits for the period from October 5, 2004 through May 7, 2007. (Docket No. 15-1 at 2-3). The parties have moved for judgment on the pleadings.

---

[2] At one place in the plaintiff's motion papers, the plaintiff asserts October 4, 2004 as his onset date (Docket No. 15-1 at page 2). However, in other places in his papers, the plaintiff uses October 5, 2004 as his alleged onset date. (Docket No. 15-1 at 3). At the supplemental administrative hearing, the plaintiff agreed that he had amended his disability onset date to be October 5, 2004. (R. 476). The Court will use October 5, 2004 as the plaintiff's alleged onset date for purposes of these proceedings.

## FACTUAL BACKGROUND[3]

Wheeler was born in 1952 and has a high school education. (R. 477). He claims he was disabled for the period in question due to pain in his back due to a herniation; pain in his neck, knees, and chest; an enlarged heart muscle; feeling lightheaded; depression; hypertension; and bilateral carpal tunnel syndrome. (R. 477-78, 481). His past relevant work was as an auto mechanic which required him to lift an average of 100 pounds at a time. (R. 479).

The record reflects that the plaintiff has had problems with his back going back to 2002. An x-ray dated April 25, 2002 revealed degenerative disc space narrowing at L5/S1, as well as mild C4/5, C5/6 and C6/7 spondylosis including disc space narrowing, and bilateral C6/7 intervertabral foramen narrowing secondary to uncovertebral joint spurring. (R. 236-37). A CT of his cervical spine on February 4, 2003, showed left paracentral and left lateral recess bony spur formation at C3-4, right paracentral and lateral recess disc herniation into the central region, with mild to moderate spinal stenosis. (R. 232).[4]

Wheeler was involved in a motor vehicle accident on July 19, 2003. (R. 194). Upon examination on August 15, 2003, he was experiencing neck pain, low back pain, left shoulder pain, knee pain and chest discomfort. The neck pain radiated to his left shoulder. He declined physical therapy and asked for a note allowing him to return to work. (R. 194). An x-ray taken

---

[3] References noted as "(R.___)" are to the certified record of the administrative proceedings.

[4] The plaintiff also asserts that the tests taken on this occasion also revealed posterior spur formations with narrowing of the neural foramina bilaterally due to bony encroachment at C6/7. (Docket No. 15-1). The plaintiff cites to the second page of the February 4, 2003 report as page 233 of the administrative transcript. The transcript filed with the Court does not include page 233. The defendant does not appear to dispute the findings of this test as reported by the plaintiff.

on August 15, 2003 revealed peritendinitis calcaria in his right shoulder with calcifications in the area of the supraspinatus tendon; mild osteoarthritis of the left acromioclavicular joint; and changes in the left shoulder suggestive of degeneration of the rotator cuff tendon. (R. 229). An x-ray of the plaintiff's cervical spine taken on July 22, 2003 again revealed spondylosis predominantly at C6/7 with mild bilateral foraminal stenosis. (R. 231).

On December 31, 2003, Wheeler was seen by Dr. Ronald Boersma with respect to chest pains. A resting cardiogram showed a sinus rhythm "with perhaps a small Delta wave in the frontal plane and V5-V6." (R. 126). A stress test was terminated after 7 minutes because Wheller "developed a significant ST depression in the inferior and lateral precordial leads which at peak effort was in the 5mm range inferiorly and 2-3 mm in the lateral precordial leads." Dr. Boersma stated that the test "provokes an ischemic ST/T vector change in the inferior and lateral precordial leads with no clinical angina pectoris symptomatlolgy." (R. 126). The test was not conclusive as to whether the result was ischemic mediated or a false positive. Dr. Boersma stated that a nuclear scan was pending and concluded that Wheeler should be limited to "sedentary work for age." (R. 126).

On January 29, 2004, Wheeler was taken to Mercy Hospital by ambulance at the direction of Dr. Michael Kane, his treating physician, after complaining of chest pains during an office vist with Dr. Kane. (R. 132). Upon examination by Dr. Deolindo Ocampos, Wheeler was found to be suffering from atypical chest pain, hypertension, gastroesophageal reflux disease and anxiety. An EKG performed on Wheeler at that time was suggestive of ischemia and his work performance was "rather low." A coronary angiogram was scheduled (R. 133). On January 30,

4

2004, a cardiac catheterization performed by Dr. Nadeem Haq. revealed normal coronary anatomy and an ejection fraction of 60 percent. (R. 138).

The plaintiff was seen by Dr. Michael Landi on February 18, 2004, for a neurological consultation due to continued neck and back pain exacerbated by the 2003 car accident. (R. 155-56). Dr. Landi stated that x-rays reflected cervical spondylosis predomniantly at C6/7 and C7/T1, and a suggestion of cervical disc herniations at C3-4 and C5-6. (R. 158). Dr. Landi also reviewd an EMG nerve conduction study conducted in 2002 and stated that the results demonstrate that Wheeler suffers from carpel tunnel syndrom "more evolved on the left than on the right." (R. 158).

The plaintiff was also examined by Dr. John A. Moscato, an orthopedic surgeon, on February 19, 2004, based upon complaints of left knee pain. (R. 152-53). On examination, Dr. Moscato observed that the plaintiff's knees were normal except that the left knee demonstrated mild point tenderness over the medial collateral ligament without instability. Dr. Moscato concluded that Plaintiff was functioning well and instructed him to do knee exercises and use heat and massage. (R. 153). From an orthopaedic standpoint, Dr. Moscato opined that Plaintiff may return to work as a maintenance man. (R. 153).

Plaintiff was examined by Dr. Ocampos, again on February 24, 2004 (R. 242-43). Plaintiff complained of an aching pain in the lower sternal region. (R. 242). Dr. Ocampos reviewed Plaintiff's past test results and concluded that the plaintiff was "somewhat reassured" and that his symptoms were atypical but that cardiological studies failed to demonstrate significant coronary artery disease. (R. 242-43). The plaintiff was seen by Dr. Kane on July 22,

2004, again complaining of chest pain and neck pain. (R. 176). Dr. Kane advised him that his past tests relating to his cardiac function were within normal limits. (R. 177).

On December 9, 2004, the plaintiff was psychiatrically evaluated by Thomas Ryan, Ph.D., a consultative examiner for the State agency. (R. 250-53). At the examination, Wheeler complained of feeling depressed, but reported no past psychiatric hospitalizations or treatment. (R. 250-51). Dr. Ryan observed that the plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, and maintain concentration and attention as well as a regular schedule, but may have some difficulty with complex tasks. Wheeler's insight was found to be "poor" and his judgement to be only "fair." (R. 252). Dr. Ryan concluded that the results of his evaluation "were consistent with psychiatric problems which may somewhat interfere with his ability to function on a daily basis." Dr. Ryan diagnosed the plaintiff as suffering from a "depressive disorder, NOS, mild". (R. 252).

On December 9, 2004, Wheeler was also evaluated by Fenwei Meng, M.D., a consultative physician for the State agency. (R. 254-58). The plaintiff complained of pain in his neck, lower back, leg, and chest. He also complained of carpal tunnel syndrome. (R. 254). On examination, Dr. Meng found that the plaintiff's gait and stance were normal; he was able to squat and walk on heels and toes without difficulty; he was able to rise from a chair without difficulty; his cervical spine flexion was full; the lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally; straight leg raising was negative bilaterally; he had a full range of motion of the upper extremities, hips, and ankles; near full range of motion of the knees with mild pain. (R. 256-257). According to Dr. Meng, a lumbosacral spine x-ray showed slight narrowing of the disc space at L5-S1 and a left knee x-ray was normal.(R. 258).

Dr. Meng diagnosed (1) status post motor vehicle accident with pain in the neck, back, and knees, (2) carpal tunnel syndrome, (3) left elbow tendonitis, and (4) chest pain (noncardiac). (R. 257). Dr. Meng concluded that the plaintiff's upper extremity had minimal limitation with dexterity due to carpal tunnel syndrome; and that the plaintiff had minimal limitation with heavy lifting, pushing, and reaching, bending, extension, and turning his head to the side. (R. 257).

In a letter dated March 21, 2005, the plaintiff's treating physician, Dr. Kane, opined that Wheeler "has difficulty doing any job that requires repetitive lifting, bending, twisting, standing or repetitive hand motions, secondary to carpal tunnel syndrome and degenerative disc disease of the neck." (R. 305). Dr. Kane further opined that the plaintiff was not helped by traditional pain medications or physical therapy. Dr. Kane concluded that Wheeler "likely has a permanent disability of a marked degree" and recommended he follow up with Dr. Landi, a neurosurgeon. (R. 305).

An April 2005 x-ray of the lumbar spine revealed mild spondylitic spurring and mild degenerative joint disease in the sacroiliac joint. (R. 327). Wheeler was again examined by Dr. Kane on September 8, 2005. (R. 318). Dr. Kane stated that the plaintiff's asthma was mild and persistent and recommended Albuterol. He also advised Wheeler to continue taking Mobic for osteoarthritis and neck pain. (R. 318). Wheeler next saw Dr. Kane on December 15, 2005. (R. 316-17). At that time, Wheeler did not complain of chest pain, palpitations, anxiety, or depression. (R. 316). Dr. Kane diagnosed osteoarthritis, dyslipidemia, asthma and concluded that the plaintiff was a "well adult."(R. 317).

The plaintiff saw Dr. Kane next on October 9, 2006. At that time, Wheeler stated that he had not experienced any regular chest pain and no exertional chest pain. (R. 313). Dr. Kane

noted that the plaintiff's osteoarthritis was controlled as was his reflux; that the plaintiff's strength was full and equal and his gait was smooth and coordinated. Dr. Kane noted Plaintiff had an abnormal stress test, gave the plaintiff a prescription for nitroglycerin and told him to go directly to the emergency room if he had any severe chest pain. (R. 313). In a letter dated October 16, 2006, Dr. Ocampus advised Dr. Kane that a recent stress echocardiographic study of the plaintiff yielded "abnormal" results. Dr. Ocampus stated that he recommended another coronary angiogram, but that the plaintiff was reluctant to undergo another angiogram because of a "bad experience" with his prior angiogram. Dr. Ocampus ordered further cardiolite stress exercise tests and pulmonary function tests. (R. 308). A stress test with ECG conducted on November 3, 2006 revealed no evidence of ischemia, exercise to 10 METS and 98% maximum predicted heart rate with no chest pain, and normal post-stress left ventricular function with an ejection fraction of 74%. (R. 310-11).

Wheeler returned to see Dr. Kane on June 25, 2007 for refill of his medications. (R. 417-18). Plaintiff complained of palpitations, heartburn and arthritis, but denied limitations of movement and muscle pain. (R. 418). Dr. Kane cleared plaintiff for proposed surgery to remove a tooth on August 18, 2007. (R. 421-22). The plaintiff saw Dr. Kane on December 18, 2007 for another "routine" visit. (R. 424). Plaintiff complained of bilateral foot achiness. Dr. Kane noted that plaintiff had just been diagnosed as having diabetes and that he was compliant with his diet plan. (R. 424). On March 26, 2008, Wheeler was seen by Dr. Kane for a follow-up relating to his diabetes and hypertension. (R. 427). Dr. Kane found that Wheeler's diabetes and hypertension were well controlled. and that the plaintiff denied chest pain, edema, fatigue, palpitations, and syncope. (R. 427-28). The plaintiff saw Dr. Kane again on July 29, 2008. At

that time Wheeler told Dr. Kane that he was feeling well and was taking his medication as prescribed. (R. 431). His diabetes was well-controlled and the plaintiff denied any bone or joint pain. (R. 432). The plaintiff returned to see Dr. Kane on October 13, 2008, for a cough and congestion. (R. 435). After examining the plaintiff, Dr. Kane concluded he had an upper respiratory infection and prescribed Zithromax. (R. 436). On December 4, 2008, Wheeler complained to Dr. Kane of right knee pain. (R. 441). Examination of the right knee revealed no edema and no tenderness. The plaintiff walked with a coordinated gait without assistance. (R. 442). His right knee was normal to inspection and palpation other than a little crepitus felt. He had no instability, bilaterally and muscle strength and tone were full bilaterally. Both knees had a full range of motion. (R. 442). Dr. Kane referred Plaintiff to Dr. Moscato. A right knee x-ray ordered by Dr. Moscato on December 4, 2008, revealed no acute fracture or dislocation, no significant joint effusion, minimal bone spur at the tibial spine, and tiny opacification projects to the lateral anterior aspect of the knee. (R. 467).

On December 13, 2008, Dr. Kane completed a Physical Residual Functional Capacity questionnaire. (R. 469-73). Dr. Kane stated that Plaintiff had cervical spondylosis, spinal stenosis, osteoarthritis of the knees, and degenerative disc disease of the lumbar spine as well as chronic pain in the neck, back, knee and shoulder. (R. 469). He asserted that the plaintiff had decreased range of motion and arthritic changes in his hands; that on the plaintiff had "to on occasion take tylenol with codeine (on top of meloxicam) that sometimes makes him drowsy." (R. 469). Dr. Kane opined that Plaintiff frequently had pain that was severe enough to interfere with his attention and concentration, but that he was capable of performing a low stress job. (R. 470). According to Dr. Kane, Wheeler was able to sit for 30 minutes and stand for 30 minutes at

one time before he needed to change positions. Dr. Kane believed that plaintiff was able to sit for at least six hours and stand/walk for about two hours in an eight-hour workday. (R. 471). He opined that it would be helpful if the plaintiff could change positions at will. The plaintiff could rarely carry ten pounds or less; but could never carry 20 pounds or more. Wheeler could never climb ladders and could rarely look down, turn his head left or right or look up. (R. 472). The plaintiff did not have significant limitations with reaching, handling, or fingering and was expected to miss work about three days per month due to his impairment or treatment. Dr. Kane also asserted that cold aggravated the plaintiff's condition and that his education may limit his ability to work. (R. 473).

At the supplemental administrative hearing, the ALJ obtained testimony from Timothy Janikowski, a vocational expert at Plaintiff's supplemental hearing in 2009. (R. 411, 413). The vocational expert was present at Plaintiff's hearing and reviewed the vocational evidence prior to the hearing. (R. 483-85). Janikowski classified Wheeler's past work as an auto mechanic as being of medium-to-heavy in exertional nature, but that the testimony indicated that it was performed by the plaintiff "at a heavy exertion." (R. 485). The ALJ asked the vocational expert to assume a hypothetical individual who can lift or carry, push or pull 20 pounds occasionally, ten pounds frequently, can sit for two out of eight hours per day, and stand or walk for six hours in an eight hour day. The ALJ added that the individual had "vocational limitations in the ability to bend, climb, stoop, squat, kneel and crawl," and "vocational limitations in reaching in all directions and in handling". (R. 485-86.) Janikowski testified that Wheeler could not perform his past relevant work. (R. 486). However, Janikowski testified that pursuant to the hypothetical proffered by the ALJ, and assuming the individual is closely approaching advanced age, the

individual would be able to work as an office helper, an information clerk, and as a parking lot attendant (R. 488-89). Modifying the hypothetical, the ALJ asked the vocational expert to fully credit the plaintiff's testimony concerning the pain and limitations he experienced. (R. 489). Janikowski testified that with those limitations, an individual would not be able to perform the three jobs previously identified. (R. 489). Upon cross-examination, Janikowski testified that if the individual missed more than 12 days per year [as Dr. Kane opined would be the case] it would be grounds for being fired. (R. 490). In addition, if the hypothetical included a limitation in which the individual was precluded from turning his neck from side to side, Janikowski stated that this limitation would be "problematic" but that he could not determine whether the individual's work production would be so compromised that it would prevent employment. (R. 492).

## DISCUSSION

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental

impairment or impairments are of such severity that [he or she] is not only unable to do [his or

her] previous work but cannot, considering [his or her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy . . . ."

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that his impairment prevents him from

returning to his previous type of employment.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.

1982).  Once this burden has been met, "the burden shifts to the [Commissioner] to prove the

existence of alternative  substantial gainful work which exists in the national economy and which

the plaintiff could perform."  Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir.

1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must

employ a five-step inquiry:

> (1) whether the plaintiff is currently working;
>
> (2) whether the plaintiff suffers from a severe impairment;
>
> (3) whether the impairment is listed in Appendix 1 of the relevant
> regulations;
>
> (4) whether the impairment prevents the plaintiff from continuing
> his past relevant work; and
>
> (5) whether the impairment prevents the plaintiff from doing any
> kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467.  If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  However, it should be noted that the ALJ has an affirmative duty to fully develop the record.  Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing his past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work he has done in the past.  20 C.F.R. §§ 404.1520(e) & 416.920(e).  When the plaintiff's impairment is a mental one, special "care must be taken to obtain a  precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work."  See Social Security Ruling 82-62 (1982);  Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994).  The ALJ must then determine the individual's ability to return to his past relevant work given his residual functional  capacity.  Washington, supra, 37 F.3d at 1442.

In the instant case, the ALJ determined that the plaintiff suffered from the following severe impairments: neck pain, low back pain, and bilateral carpal tunnel syndrome. (R.  383).  The ALJ also found that the plaintiff suffered from the following non-severe impairments: depressive disorder, chest pain, diabetes mellitus. (R.  383).  The ALJ determined that these impairments did not meet the listings set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R.  384).  The ALJ found that Wheeler could perform "light work" as defined in 20 C.F.R.

416.967(b).  The ALJ determined that the plaintiff could not perform his past relevant work.

Wheeler was 52 years old on October 5, 2004, the alleged onset date of his disability.  Under the

applicable regulations, a 52 year old individual is considered "closely approaching advanced

age." On May 8, 2007, the plaintiff became 55 years old and became classified as being an

individual of  "advanced age" on that date.  20 C.F.R. 416.963.  The ALJ determined that prior to

May 8, 2007, the plaintiff retained the residual functional capacity to perform jobs in the national

economy, specifically: an office helper, an information clerk, and a parking lot attendant. (R.

388).  Beginning and subsequent to May 8, 2007, as an individual of "advanced age," the ALJ

determined that Wheeler was not capable of performing a significant number of jobs in the

national economy. (R.  388-89).

The plaintiff argues that the ALJ erred in finding that he retained the residual functional

capacity to perform work between October 5, 2004 and May 7, 2007.  The plaintiff asserts: (1)

that the ALJ's determination that he could perform light work during that period is not supported

by substantial evidence in the record; (2) that the ALJ failed to properly assess the plaintiff's

credibility; and (3) that the hypothetical question posed by the ALJ to the vocational expert did

not consider the full extent of the plaintiff's impairments.


Residual Functional Capacity

The plaintiff argues that the ALJ failed to provide a function by function assessment of

Wheeler's residual functional capacity as required under Social Security Regulation ("SSR") 96-

8,  and also failed to properly consider the assessment made by the plaintiff's treating physician,

Dr. Kane.

Pursuant to that regulation, an ALJ's assessment of the claimant's RFC must include a function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis. With regard to physical limitations, this means the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Walters v. Astrue, 2013 WL 598331 (N.D.N.Y. 2013) citing Martone v. Apfel, 70 F.Supp.2d 145, 150 (N.D.N.Y.1999). Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy. Hogan v. Astrue, 491 F.Supp.2d 347 (W.D.N.Y. 2007). Generally, a function-by-function analysis need not discuss those capacities for which no limitation is alleged. See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir.2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir.2003) (an ALJ does not fail in his or her duty to assess a claimant's residual functional capacity on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found); Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir.2002); Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir.2000)("Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's residual functional capacity case law does not require the ALJ to discuss those capacities for which no limitation is alleged."); Zatz v. Astrue, 346 F. App'x 107, 111 (7th Cir.2009) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no

conflicting medical evidence.").  In <u>Walters</u>, the Court recently summarized the caselaw

regarding this issue by the various District Courts in this Circuit:

> District courts in the Second Circuit have reached conflicting
> conclusions. See, e.g., <u>Wood v. Comm'r of Soc. Sec.</u>,  No.
> 06–CV–157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009)
> (collecting cases); <u>McMullen v. Astrue</u>, 05–CV–1484, 2008 WL
> 3884359, at *6 (N.D.N.Y. Aug.18, 2008); <u>Brown v. Barnhart</u>, No.
> 01–CV–2962, 2002 WL 603044, at *5–7 (E.D.N.Y.Apr.15, 2002)
> ("In sum, because the ALJ did not properly apply the legal standard
> in Social Security Ruling 96–8p for assessing residual functional
> capacity, I cannot properly conclude that his finding that the
> claimant retained the residual functional capacity to do her past
> work was supported by substantial evidence."); <u>Matejka v.
> Barnhart</u>, 386 F.Supp.2d 198, 208 (W.D.N.Y.2005) ("The ALJ's
> decision did not address the plaintiff's ability to sit, stand, or walk
> ... Since the ALJ failed to make a function-by-function analysis of
> plaintiff's RFC, his determination that she had the RFC for
> sedentary work is not supported by substantial evidence."); but see
> <u>Casino–Ortiz v. Astrue</u>, 2007 WL 2745704, at *13 (S.D.N.Y.
> Sept.21, 2007) (sustaining ALJ's decision, notwithstanding failure
> to provide function-by-function analysis); <u>Novak v. Astrue</u>, No. 07
> Civ. 8435, 2008 WL 2882638, at *3 & n. 47 (S.D.N.Y. July 25,
> 2008) ("The A.L.J. must avoid perfunctory determinations by
> considering all of the claimant's functional limitations, describing
> how the evidence supports her conclusions, and discussing the
> claimant's ability to maintain sustained work activity, but she need
> not provide a narrative discussion for each function."); but see
> <u>Martin v. Astrue</u>, No. 05–CV–72, 2008 WL 4186339, at *16
> (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that
> the ALJ grouped the functions in his function-by-function analysis
> because "treating the activities separately would not have changed
> the result of the RFC determination").

<u>Walters</u>, 2013 WL 598331 at *4. There, the court concluded that "the function-by-function

assessment is an important regulatory requirement (which, ultimately, is designed to ensure that

careful consideration is given to any and all of the claimant's work-related limitations) that

should not (and, indeed, may not) be lightly set aside or in any way treated casually." Walters, 2013 WL 598331 at *5.

Here, in "Finding of Fact and Conclusion of Law" number 5, the ALJ determined that the plaintiff possessed "the residual functional capacity to perform light work ... except can occasionally bend, climb, stoop, squat, kneel and crawl; occasionally reach in all direction with both hands; and occasionally handle (perform gross manipulations) with both hands." (R. 384). This statement is set forth in conclusory form and does not address these capacities in relation to the medical evidence in the record. The ALJ does not make any specific assessment of Wheeler's ability to sit, stand, or walk. With respect to the plaintiff's ability to lift, the ALJ noted that the plaintiff's testified that he could lift 20 pounds without a problem (R. 385), but did not analyze this testimony in light of the medical evidence and opinion in the record. The record in this case reflects that the plaintiff's ability to sit, stand, walk and lift are impacted to some degree by his various impairments. The ALJ erred in failing to individually assess these capacities prior to making a determination as to Wheeler's residual functional capacity.

Also, the ALJ noted Dr. Kane's March 31, 2005 opinion that Wheeler "likely has a permanent disability of a marked degree" which was based upon Dr. Kane's assessment that the plaintiff had "difficulty doing any job that requires repetitive lifting, bending, twisting, standing or repetitive hand motions secondary to carpal tunnel syndrome and degenerative disc disease of the cervical spine." (R. 305). Notwithstanding, the ALJ stated that Dr. Kane's opinion in this regard was "given little weight because of the objective clinical evidence and other vocational factors, including age, education and past relevant work prior to May 8, 2007." (R. 386). The ALJ does not specify what clinical evidence in the record contradicts Dr. Kane's March 31, 2005

assessment.  Moreover, in making his residual functional capacity assessment the ALJ completely failed to discuss Dr. Kane's December 13, 2008 residual functional capacity assessment.  At that time, Dr. Kane opined that Wheeler suffered from chronic back, neck, knee and shoulder pain; that physical examination showed a decreased range of motion and arthritic changes in the plaintiff's hands; that the plaintiff occasionally takes Tylenol with codeine in addition to meloxicam which would make him drowsy; that these impairments would frequently interfere with the plaintiff's attention and concentration needed to perform even simple work; that the plaintiff could sit only up to 30 minutes at one time; could stand only 30 minutes at one time; could sit approximately 6 hours in an 8-hour work day; stand only 2 hours in an 8-hour work day; could rarely pick up 10 pounds; could never pick up 20 pounds; and would miss about three days per month due to his impairments or treatment.  Dr. Kane did find that "if a job without manual labor was available with somewhat flexible hours, he might be able to work." (R. 470-72).  Although this residual functional capacity was not completed within the period at issue (between October 5, 2004 and May 7, 2007), the assessment suggests that Wheeler had been followed by Dr. Kane since 2002 and that the impairment discussed were chronic in nature.  This residual functional capacity assessment is not inconsistent with Dr. Kane's December 31, 2005 opinion regarding Wheeler's capacity.

The ALJ's residual functional capacity determination also failed to take into consideration the opinion of the state's consulting psychologist, Dr. Ryan, who opined that although the plaintiff could follow and understand simple instructions, he would have difficulty with complex tasks; his insight was poor and his judgement was fair; concluding that Wheeler

suffered from a "depressive disorder" and "psychiatric problems which may somewhat interfere with his ability to function on a daily basis.: (R. 252).

Based upon this record, the ALJ's residual functional capacity assessment is not supported by the record. This matter should be remanded for further administrative proceedings so that the ALJ can make a function-by-function assessment of the plaintiff residual functional capacity. The ALJ should also consider the opinion of Dr. Ryan, and reconsider Dr. Kane's opinions as stated in the December 31, 2005 letter and December 13, 2008 assessment in making a residual functional capacity assessment.


Credibility

The plaintiff also argues that the ALJ failed to properly assess the plaintiff's credibility as to the pain and limitations caused by his impairments.

An ALJ "is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929," however, he or she is "not require[d] to accept the claimant's subjective complaints without question," Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.2010). Rather, the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Id. This requires a two-step process. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Id. If so, the ALJ must then consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." Id. (internal quotation marks omitted; alteration in Genier ). If the plaintiff offers statements about pain or other symptoms that are not

substantiated by the objective medical evidence, "the ALJ must engage in a credibility inquiry." Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir.2010) (summary order) (citing 20 C.F.R. § 404.1529(c)(3)). In making this credibility determination, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3) (i)-(vii); see also Meadors, 370 F. App'x at 184 n. 1. The ALJ, however, is not required to discuss all seven factors in his decision as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasons for that weight. Snyder v. Barnhart, 323 F.Supp.2d 542, 546–47 & n. 5 (S.D.N.Y.2004).

In the instant matter, in discussing the plaintiff's credibility the ALJ stated:

> The claimant is able to perform the following daily activities, do laundry, take out the trash, carry packages, drive, and is able to bathe and dress himself. The claimant testified that he could lift 20 pounds without a problem. He also testified that he only takes Tylenol for pain. It is concluded that the pain is not as severe as alleged. The undersigned gives the claimant the benefit of the doubt in assigning a light residual functional capacity. After considering the evidence of the record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible prior to May 8, 2007, but not to the extent alleged. The claimant's allegations of disability are inconsistent with his activities of daily living.

(R. 385).

The record reflects that the plaintiff testified that he does "some laundry;" he can drive a car; he can bathe and dress himself; he could lift 20 pounds; walk one block; sit for 1 hour; and stand for 45 minutes. (R. 480) Wheeler also testified that he does not do any yard work; he has problems sleeping because he experiences chest pain and shoulder pain; he has problems with his arms and hands; he cannot reach over his head with this arms; he could not push or pull or squat without a problem; he could not climb without a problem; cold weather bothers him; he has a stabbing pain in his knee, back and neck; he takes Tylenol for pain; and that Dr. Kane advised him to avoid twisting or bending. (R. 480-81). In addition, the plaintiff testified that he was scheduled to see a specialist about his knee; and that his elbow was bothering him to the extent that "picking up a glass of pop to drink can make it hurt." (R. 482).

As noted above, the ALJ found the plaintiff "generally credible" but "not to the extent alleged." (R. 385). However, the *sole* basis proffered for this determination by the ALJ is the conclusion that Wheeler's "allegations of disability are inconsistent with his activities of daily living." However, the ALJ makes no attempt to explain how any of the plaintiff's daily living activities impact the credibility of the plaintiff's testimony regarding his limitations. Moreover, the fact that the plaintiff can perform the daily activities described in his testimony does not support a conclusion that the plaintiff can perform substantial gainful activity as required to function in a job setting. See Knighton v. Astrue, 2012 WL 951575, at *8 (N.D.N.Y. Mar.20, 2012) (holding that activities such as caring for pets, preparing simple meals, driving a vehicle, and helping with household chores do not by themselves contradict allegations of disability). The Second Circuit has held that "a claimant need not be an invalid to be found disabled." Murdaugh v. Sec'y of Dept. of Health & Human Services of U.S., 837 F.2d 99, 102 (2d Cir.1988). Daily

activities are only one of numerous factors an ALJs may—and should—consider when evaluating symptoms. See also 20 C.F.R. § 404.1529(c) (1)(I). Upon remand, the ALJ should fully consider the evidence in the record relating to the plaintiff's residual functional capacity, as well as the plaintiff's testimony, prior to re-assessing the plaintiff's credibility. Flagg v. Astrue, 2012 WL 3886202 (N.D.N.Y. 2012)(Accordingly, the Court remands and instructs the ALJ to reconsider the record as a whole and apply the treating physician rule before reassessing Plaintiff's credibility. In doing so, the Court notes that the ALJ should consider the cumulative effect of Plaintiff's disabilities.).


Hypothetical Question Posed to Vocational Expert

Finally, the plaintiff argues that the ALJ erred in relying upon the testimony of the vocational expert in this case because the hypothetical question posed to the expert did not adequately address the full range of the plaintiff's limitations.

A vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job. Parker v. Harris, 626 F.2d 225, 231 (2d Cir.1980). Hypothetical questions constructed to assist a vocational expert in determining whether there are any employment possibilities for a claimant are defective where they do not account for his actual limitations. Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir.1981); see also Gilliam v. Califano, 620 F.2d 691, 693–694 (8th Cir.1980). Vocational testimony elicited by hypothetical questions that fail to relate with precision to the physical and mental impairments of a claimant is not substantial evidence on which an ALJ may base a decision. Bradley v. Bowen, 800 F.2d 760, 763 (8th Cir.1986).

Because, as discussed above, the ALJ failed to take into consideration all of the plaintiff's limitations when making his determination of Wheeler's residual functional capacity, the ALJ's hypothetical failed to account for all of the plaintiff's limitations. See <u>Mathews v. Barnhart</u>, 220 F.Supp.2d 171 (W.D.N.Y. 2002)(The ALJ's determination that plaintiff was capable of performing the jobs of information clerk and surveillance systems technician is not supported by substantial evidence. Specifically, the ALJ erred by constructing hypothetical questions for the vocational expert that failed to include all of the plaintiff's non-exertional limitations.). This matter should be remanded for further administrative proceedings consistent with the above.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court recommends that the decision of the Commissioner be VACATED and this matter be REMANDED for further administrative proceedings consistent with the above.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO**

**FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.


/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
May 14, 2013

24